**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00325-CV**
_____

**PACKARD ENGINEERING ASSOCIATES AND RICHARD PACKARD,**
**Appellants**

**V.**

**THE SALLY GROUP, L.L.C. D/B/A RIO24 CIGARS AND PREMIER BAR,**
**MICHAEL WILSON, MARY WILSON, AND BONNY J. WILSON,**
**Appellees**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 12-04-04482 CV**

## OPINION

Appellants Packard Engineering Associates and Richard Packard (collectively "Packard") appeal the trial court's order denying their motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 150.002 (West 2011). We affirm the trial court's order in part and reverse in part and remand the cause for further proceedings consistent with this opinion.

1

BACKGROUND

Appellees The Sally Group, L.L.C. d/b/a Rio24 Cigars and Premier Bar ("Rio24"), Michael Wilson, Mary Wilson, and Bonny J. Wilson filed suit against appellants and other parties for alleged negligence, breach of contract, violations of the Deceptive Trade Practices Act ("DTPA"), and common-law fraud concerning the design, engineering, installation, and implementation of a humidification system at Rio24's place of business, a cigar bar in The Woodlands, Texas. Michael Wilson alleged that he was Rio24's principal. Michael Wilson and Bonny J. Wilson contended that they were guarantors on Rio24's lease as well as a note. Michael Wilson's wife, Mary Wilson, asserted that she "is also obligated to [Rio24's] creditors by virtue of the fact these would be considered community obligations."

After being hired by the architect, professional engineer Richard Packard of Packard Engineering Associates prepared the engineering drawings for the humidification system at Rio24. Appellees contended that after Rio24 opened, the business experienced problems with excessive humidity in the humidor, and the humidity controller did not work. According to appellees, they received many complaints from customers that cigars were too wet and would not burn properly. Appellees also alleged that as the outside humidity decreased, Rio24 began to

experience problems with low humidity levels in the walk-in humidor, and that water condensation ultimately dripped from the ceiling of the humidor, "destroying entire boxes of cigars, as well as affecting the contents of members' lockers, wet-staining the Spanish cedar wood that composed the lockers, and staining/damaging the humidor ceiling." According to appellees, customers complained, and Rio24 was unable to save wet cigars. Appellees asserted that a large amount of black mold eventually appeared on the Spanish cedar wood and the cigars on several shelves, and that the protocol for remediation of the mold required removal of the humidor, as well as most of the ceiling in the bar area.

According to appellees' petition, Rio24's landlord ordered the business to close when the mold was discovered, resulting in Rio24's loss of "its entire capital investment (approximately $800,000.00), its cigar inventory, its revenue stream, which was showing growth and profit as of November, 2010, and the goodwill the business had generated." Appellees also maintain that they had to default on their rental agreement and their business loan, both obligations had been accelerated, and the personal property located on Rio24's premises was seized and sold at auction. Appellees further alleged that they defaulted on other debts, and that the cost of remediating the mold was deducted from Rio24's tenant security deposit. Appellees asserted that Rio24's losses totaled at least $5,000,000, and that Michael

Wilson, Mary Wilson, and Bonny J. Wilson had each lost at least $500,000. Appellees alleged causes of action for breach of contract, DTPA violations, common-law fraud, and negligence.

With their petition, appellees provided as their certificate of merit the affidavit of professional engineer Ronald W. Brown of Consulting MEP Engineers. According to Brown, appellees had specified that the humidor maintain a temperature of seventy degrees and 70% relative humidity, while the remainder of the area was to maintain a temperature of seventy-four degrees and 50% relative humidity. Brown noted that there was only one air handling unit (AHU) for the entire lease space, and that "[i]t is very difficult to achieve two different design points . . . when there is only one zone off of one AHU." In addition, Brown stated that although the air cooled condensing unit (ACCU) specified by the drawings indicated a 15-ton Trane Model TTA180, the ACCU installed was a 12.5-ton Carrier Model 38ARD016. Brown also indicated that although the drawings indicated a 15-ton Trane Model TWE 180 AHU, a 12.5-ton Carrier Model 40RM-016 AHU was installed. According to Brown, the ACCU is a two-stage model, which

> means one stage will cycle off when the internal heat gain is operating
> at a reduced load. This can result in elevated cooling coil leaving air
> temperature and higher space humidity primarily because there is only
> a single stage of cooling in operation. Usually this is not a problem

4

> because the cooling stage only cycles off at reduced load and the cooling unit will operate at reduced capacity in close relation to the load. The 70 degree design point for the Humidor may cause the unit to operate with both stages of cooling in demand. This will cause the space to over cool in the lease space.

Brown further stated that although the manufacturer's literature for the ACCU advised "for the unit to have a clear discharge path over the top of the unit[,] [t]his was not possible in this instance."

According to Brown, there was no vapor barrier between the bar area and the humidor area, which "can result in an increase in moisture supplied by the humidifier due to loss of moisture from the high humidity area to the lower humidity area." Brown also observed that the humidifier is designed to be discharged directly into the air duct that serves the space, but in this case, the duct that serves the humidor was

> basically the same duct that serves the bar area which is held at approximately 50% [relative humidity]. This means the humidifier has to continuously add moisture to the supply duct system. Unfortunately, during the cooling mode, the supply duct contains saturated air and will not hold any more moisture. The result is the moisture will condense on any cold surface, and simply be discharged from the duct into the humidor. That is what happened here, and the results were moisture on the floor and walls, causing mold to appear.

Brown stated that his review of the drawings revealed that the exhaust air discharge point is located approximately six feet from the outside air intake, but the Building Code requires a minimum of ten feet. Because the outside air intake

5

was 2,200 cfm, the design meant that the space was at neutral air pressure, but should have been designed and operated at "some positive air pressure to prevent unwanted moisture and contaminants from entering the space[;]" and "this amount of outside air will continue to be introduced into the space even if the compressor unit cycles off one of the stages of cooling capacity . . . [which] will increase space humidity." Brown concluded that a properly designed, constructed, and installed humidification system would not have discharged additional moisture from the humidifier into the supply duct, but instead directly into the humidor; two cooling units should have been installed for the two different areas; and the "amount of outside air should have been pre-treated to remove any excess moisture." Brown opined that Packard failed to meet the standard of care by trying to design a system that has "two separate temperature control zones off a single air handling unit[;]" trying to "design a system that has two separate humidity zones off one unit[;]" failing to design the ACCU in accordance with the manufacturer's recommendations; placing the exhaust air discharge too close to the outside air makeup; designing a system in which "the [ACCU] may cycle off as required by the temperature sensor, and permit too much moisture to enter the humidity-controlled space[;]" and failing to "verify the requirement for a moisture barrier between the two zones of moisture control."

6

Packard filed a motion to dismiss, in which Packard asserted that appellees failed to comply with the requirements of section 150.002 of the Texas Civil Practice and Remedies Code, which mandates the filing of a certificate of merit that specifically sets forth, for each theory of recovery, the alleged negligence, error, or omission of Packard. *See* Tex. Civ. Prac. & Rem. Code Ann. § 150.002(b), (e). The trial court signed an order denying Packard's motion to dismiss, and Packard filed this appeal. *See id*. § 150.002(f) ("An order granting or denying a motion for dismissal is immediately appealable as an interlocutory order.").

PACKARD'S ISSUE – THE CERTIFICATE OF MERIT

In its sole appellate issue, Packard complains that the trial court should have granted the motion to dismiss because although the certificate of merit addressed appellees' negligence claim, it did not address appellees' breach of contract, DTPA, and fraud claims. We review an order denying a motion to dismiss pursuant to section 150.002 under an abuse of discretion standard. *Hardy v. Matter*, 350 S.W.3d 329, 331 (Tex. App.—San Antonio 2011, pet. dism'd); *Criterium-Farrell Eng'rs v. Owens*, 248 S.W.3d 395, 397 (Tex. App.—Beaumont 2008, no pet.); *see also Palladian Bldg. Co., Inc., v. Nortex Found. Designs, Inc.*, 165 S.W.3d 430, 433 (Tex. App.—Fort Worth 2005, no pet.). An abuse of discretion occurs when

the trial court acts in an unreasonable and arbitrary manner or without reference to any guiding rules or principles. *Palladian*, 165 S.W.3d at 433 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court does not demonstrate an abuse of discretion. *Id*. However, a clear failure by the trial court to analyze or apply the law correctly also constitutes an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

Section 150.002 of the Civil Practice and Remedies Code[1] provides as follows, in pertinent part:

(a) In any action . . . for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party . . . licensed professional engineer. . . .

(b) The affidavit shall set forth specifically *for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission* of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist and the factual basis for each such claim. . . .
. . .

(e) The plaintiff's failure to file the affidavit in accordance with this section shall result in dismissal of the complaint against the defendant. This dismissal may be with prejudice.

---

[1]The parties agree that the 2009 version of the statute applies to this lawsuit, in which the original petition was filed on April 26, 2012.

Tex. Civ. Prac. & Rem. Code Ann. § 150.002(a), (b), (e) (emphasis added). "'Factual basis' is not defined in the statute, but courts have held that the purpose of the certificate of merit 'is to provide a basis for the trial court to conclude that the plaintiff's claims have merit.'" *Durivage v. La Alhambra Condo. Ass'n*, No. 13-11-00324-CV, 2011 WL 6747384, at *3 (Tex. App.—Corpus Christi Dec. 21, 2011, pet. dism'd) (mem. op.) (quoting *Criterium-Farrell Eng'rs*, 248 S.W.3d at 400). However, "[s]ection 150.002(b) does not require that the 'third-party' 'licensed professional engineer' explain the law to the trial court." *Nangia v. Taylor*, 338 S.W.3d 768, 772 (Tex. App.—Beaumont 2011, no pet.). The statute does not require a claimant to marshal his evidence, and it does not foreclose the defendant from later challenging the sufficiency of the claimant's evidence or the admissibility of the expert's opinion by filing a motion to exclude the testimony or a motion for summary judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 150.002; *CBM Eng'rs, Inc. v. Tellepsen Builders, L.P.*, No. 01-11-01033-CV, ___ S.W.3d ___, 2013 WL 125713, at *6 (Tex. App.—Houston [1st Dist.] Jan. 10, 2013, pet. filed) (not yet released for publication).

We address appellees' breach of contract and DTPA causes of action together. Appellees contended that Packard entered into a contract to design, engineer, construct, and install "an appropriate and adequate humidification system

9

for the premises' humidor[,]" and that Packard breached the contract by "utterly failing" to do so. According to appellees, Packard also engaged in false, misleading, and deceptive acts by failing to comply with express and implied warranties made concerning the humidification system, and that Packard's alleged representations violated sections 17.46(b)(5), (7), (12)  and 17.50(a)(2), (3) of the DTPA. *See* Tex. Bus. & Comm. Code Ann. §§ 17.46(b)(5), (7), (12), 17.50(a)(2), (3) (West 2011). More specifically, appellees pleaded that Packard violated the DTPA by (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have, (2) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, and (3) representing that a contract confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law. *See id.* § 17.46(b)(5), (7), (12). Appellees also alleged that Packard violated section 17.50(a)(2) and (3) "by their respective repeated acts and failures to act as hereinabove specified." Section 17.50(a)(2) deals with breach of an express or implied warranty, and subsection (3) deals with "any unconscionable action or course of action[.]" *Id.* § 17.50(a)(2), (3).

As discussed above, Brown's affidavit stated that the ACCU and AHU installed at Rio24's premises were not made by the manufacturer specified in the

10

drawings, nor were they the capacity specified in the drawings. Brown opined that Packard was negligent and failed to meet the industry standard of care for design and engineering by designing two separate temperature control zones off of a single air-handling unit, causing excessive moisture to form in the duct system during the cooling mode; did not install the ACCU in accordance with the manufacturer's recommendations; placed the air discharge location too close to the outside air makeup; designed the system in a way "where the [ACCU] may cycle off . . . and permit too much moisture to enter the humidity controlled space[;]" and "failed to verify the requirement for a moisture barrier between the two zones of moisture control." Although Brown's affidavit couches some of the enumerated acts and omissions of Packard in terms of negligence, the assertions also provide a "factual basis" for appellees' breach of contract claim.

The Supreme Court has held that a contractual relationship may create duties under both contract and tort law, and "[t]he acts of a party may breach duties in tort or contract alone or simultaneously in both." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). Therefore, we reject the notion that the portions of Brown's affidavit that characterize Packard's acts and omissions as negligent may not also serve to provide a factual basis for appellees' breach of contract claim. As discussed above, the statute does not foreclose appellants from later challenging

11

the sufficiency of appellees' evidence as to a particular cause of action or the admissibility of the expert's opinion by filing a motion to exclude the testimony or a motion for summary judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 150.002. The issue of whether appellees' causes of action most appropriately properly sound in negligence, breach of contract, or both, is one that the parties may litigate at a later stage of the proceeding, since the purpose of the certificate of merit is simply to provide a basis for the trial court to conclude that appellees' claims have merit. *See Criterium-Farrell Eng'rs*, 248 S.W.3d at 400.

We conclude that Brown's affidavit provides a factual basis for appellees' claim that Packard breached the contract by failing to properly design, engineer, construct, and install an "appropriate and adequate" humidification system. We further conclude that Brown's affidavit provides a factual basis for appellees' claim that Packard represented that some of the goods or services provided have characteristics that they do not have, or are of a particular style or model when they are, in fact, another. Brown's affidavit provides a factual basis for appellees' breach of contract and DTPA claims; therefore, the trial court did not abuse its discretion by refusing to dismiss those claims. *See Nangia*, 338 S.W.3d at 773. Accordingly, we overrule Packard's issue with respect to the breach of contract and DTPA claims.

12

We turn now to appellees' fraud claim. Appellees alleged that Packard "concealed from Rio24 the true nature and extent of the problems associated with the humidification system, most particularly its flawed design, engineering[,] and construction[]" and that although Packard "knew the humidification system designed, engineered[,] and installed for Rio24 was flawed, would never operate as intended, and would ultimately fail," Packard never informed Rio24 of the facts. According to appellees, Packard should have known that the alleged false representations to Rio24 would adversely affect its business and that if Packard had "told Rio24 the truth, Rio24 may have pursued other options that would have allowed it to correct the flawed, ill-designed humidification system and remain in business through today."[2]

The elements of fraud are: (1) a material representation was made; (2) the representation was false; (3) the speaker knew when the representation was made that it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) in making the representation, the speaker intended that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The affidavit does not identify or

[2]Appellants concede that the affidavit provided by appellees addresses the negligence claims. Therefore, we will not discuss the negligence claims.

otherwise discuss any knowingly false or recklessly-made representations by Packard upon which Packard intended appellees to rely to their detriment. *See id*.; *see also Garza v. Carmona*, No. 13-11-00077-CV, ___ S.W.3d ___, 2012 WL 1134014, at *6 (Tex. App.—Corpus Christi Apr. 5, 2012, no pet.) (not yet released for publication). Therefore, we conclude that the trial court abused its discretion by denying Packard's motion to dismiss with respect to appellees' fraud claim. Accordingly, we sustain Packard's issue in part and remand the cause to the trial court to determine whether the dismissal of appellees' fraud claim should be with or without prejudice to refiling. *See* Tex. Civ. Prac. & Rem. Code Ann. § 150.002(e); Tex. R. App. P. 43.2(d); *Garza*, 2012 WL 1134014, at *7.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

_____
STEVE McKEITHEN
Chief Justice

Submitted on January 10, 2013
Opinion Delivered March 28, 2013
Before McKeithen, C.J., Gaultney and Kreger, JJ.

14