**Affirmed and Memorandum Opinion filed June 3, 2014.**



In the

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-13-00863-CV

**SIEMENS ENERGY, INC. F/K/A SIEMENS POWER GENERATION, INC., Appellant**

**V.**

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, FACTORY MUTUAL INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES, LIMITED ARCH INSURANCE COMPANY (EUROPE) LTD., AND CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, Appellees**

**On Appeal from the 344th District Court**
**Chambers County, Texas**
**Trial Court Cause No. 27811**

## M E M O R A N D U M   O P I N I O N

In this interlocutory appeal, appellant Siemens Energy, Inc. f/k/a Siemens Power Generation, Inc. ("Siemens") challenges the trial court's denial of its motion to dismiss the breach-of-contract and professional negligence claims brought by

appellee National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and other insurer appellees (collectively, "National Union")[1] for failure to file an adequate certificate of merit pursuant to section 150.002 of the Texas Civil Practice and Remedies Code. Siemens argues that National Union's expert affidavit failed to identify any specific engineering act, error, or omission committed by Siemens, and failed to set forth the factual basis for National Union's claims. Siemens further contends the trial court should have dismissed National Union's case with prejudice. Finding no abuse of discretion, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Siemens designed, manufactured, and sold a natural gas, combined cycle generating unit (referred to as "Unit 4") to NRG Cedar Bayou Development Company, LLC, a subsidiary of NRG Energy, Inc. ("NRG"), for its Cedar Bayou Electrical Generating Facility in Baytown, Texas. Unit 4 consists of two Siemens 501 gas turbines, two heat recovery steam generators, and one Siemens KN steam turbine (the "Turbine").

On May 22, 2008, NRG and Siemens entered into a purchase order containing an agreement for Technical Field Assistance (the "TFA"). In the TFA, Siemens agreed to provide NRG with technical field assistance to support the installation of certain Siemens-supplied equipment, including the Turbine. NRG paid Siemens $4.6 million pursuant to the purchase order containing the TFA.

In its petition, National Union alleged that on or about April 24, 2009, a Siemens engineer "supervised, inspected and/or approved the alignment of the Turbine . . ., which included the alignment of the coupling between the HP/IP and LP rotors of the Turbine." National Union also alleged that prior to March 11,

---

[1] National Union brought the action in subrogation for their insureds.

2011, "Siemens representative(s) also programmed the Turbine for use in Unit 4." According to National Union, on March 11, 2011, the Turbine "was in start-up mode when it failed and tripped off line on loss of vacuum and high vibration after reaching approximately 3,570 rpm." Such failure allegedly "caused damages to . . . the Turbine's rotors and related equipment" and was caused by "misalignment of the coupling between the HP/IP and LP rotors of the Turbine," as well as by "an error in the initial programming of the Turbine which prolonged the time during which the Turbine was subjected to excessive vibration associated with the misalignment."

National Union filed suit against Siemens for breach of contract and professional negligence, claiming damages in excess of $20 million. To its original petition, National Union attached an affidavit from Timothy B. Hatch, a registered professional engineer and consulting engineer for Engineering Design & Testing Corp. A copy of Hatch's curriculum vitae was attached to his affidavit.

Siemens filed a motion to dismiss on the basis that National Union's certificate-of-merit affidavit failed to meet the requirements of section 150.002 of the Texas Civil Practice and Remedies Code.[2] The trial court denied Siemens' motion, and Siemens filed this interlocutory appeal.

Siemens brings three issues on appeal. First, Siemens argues that National Union's claims must be dismissed because their expert failed to identify any specific engineering act, error, or omission committed by Siemens. Second, Siemens asserts that the claims must be dismissed because the affidavit failed to set forth the factual basis to support the expert's conclusions. Third, Siemens

---

[2] *See* Tex. Civ. Prac. & Rem. Code § 150.002(e) (West 2011). As part of its motion, Siemens challenged Hatch's qualifications under section 150.002. Siemens does not raise this issue on appeal.

contends that National Union's action should be dismissed with prejudice. We conclude that the trial court did not abuse its discretion in concluding National Union's certificate of merit complies with section 150.002's requirements.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

An order denying a motion to dismiss for failure to file a certificate of merit in accordance with section 150.002 is immediately appealable. *See* Tex. Civ. Prac. & Rem. Code § 150.002(f) (West 2011). We review a trial court's order on such a motion for an abuse of discretion. *Dunham Eng'g, Inc. v. Sherwin-Williams Co.*, 404 S.W.3d 785, 789 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In reviewing a trial court's denial of a section 150.002 motion to dismiss, we review the record in the light most favorable to the ruling. *See Howe-Baker Eng'rs, Ltd. v. Enter. Prods. Operating, LLC*, No. 01-09-01087-CV, 2011 WL 1660715, at *5 (Tex. App.—Houston [1st Dist.] Apr. 29, 2011, no pet.) (mem. op.).

Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court does not demonstrate an abuse of discretion. *Dunham Eng'g*, 404 S.W.3d at 789. However, the trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *Id.* A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Id.* As the party complaining of an abuse of discretion, Siemens has the burden of bringing forth a record showing such abuse. *See TDIndus., Inc. v. My Three Sons, Ltd.*, No. 05-13-00861-CV, 2014 WL 1022453, at *4 (Tex. App.—Dallas Feb. 14, 2014, no pet. h.) (mem. op.).

To the extent we are required to interpret a statute, that aspect of our review is performed de novo. *See Dunham Eng'g*, 404 S.W.3d at 789. We look to the statute's plain meaning because we presume that the legislature intends the plain

4

meaning of its words. *Id.* In doing so, we read the words in context and construe the language according to the rules of grammar and common usage. *Id.*; *see* Tex. Gov't Code Ann. § 311.011(a) (West 2013).

Section 150.002 provides, in relevant part:

(a) In any action . . . for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party . . . licensed professional engineer . . . who:

(1) is competent to testify;

(2) holds the same professional license or registration as the defendant; and

(3) is knowledgeable in the area of practice of the defendant and offers testimony based on the person's:

(A) knowledge;

(B) skill;

(C) experience;

(D) education;

(E) training; and

(F) practice.

(b) The affidavit shall set forth specifically for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist and the factual basis for each such claim. The third-party . . . licensed professional engineer . . . shall be licensed or registered in this state and actively engaged in the practice of . . . engineering . . . .

. . .

(e) The plaintiff's failure to file the affidavit in accordance with this section shall result in dismissal of the complaint against the defendant. This dismissal may be with prejudice.

(f) An order granting or denying a motion for dismissal is immediately appealable as an interlocutory order.

Tex. Civ. Prac. & Rem. Code § 150.002.

The certificate of merit serves the "legislative goal of requiring merely that plaintiffs make a threshold showing that their claims have merit." *M-E Eng'rs, Inc. v. City of Temple*, 365 S.W.3d 497, 504 (Tex. App—Austin 2012, pet. denied). "[A]t the certificate-of-merit stage, before discovery and before other dispositive motions are available, the plaintiff is not required to fully 'marshal his evidence.'" *Dunham Eng'g*, 404 S.W.3d at 795 (quoting *CBM Eng'rs, Inc. v. Tellepsen Builders, L.P.*, 403 S.W.3d 339, 346 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (op. on reh'g)).

### III.    ANALYSIS

**A. The affidavit sets forth sufficiently specific negligence, or other actions, errors, or omissions by Siemens in providing the professional service.**

In its first issue, Siemens argues the "bare, conclusory" allegations in Hatch's affidavit do not satisfy section 150.002(b)'s requirement that the affidavit "specifically" identify the professional errors claimed to exist. We disagree with this characterization of Hatch's affidavit.

#### 1.  National Union's petition

National Union alleged in its petition that, under the TFA,[3] "Siemens agreed to provide NRG with certain professional engineering services in connection with the construction, assembly, alignment and/or programming of the Turbine in Unit 4 at the Facility." National Union further alleged, pursuant to the TFA, that Siemens agreed to provide "inspection and supervision of the Turbine installation for proper

---

[3] National Union attached the TFA to its petition.

6

assembly, clearances, alignment and cleanliness, and to advise NRG of errors and/or omissions with respect to these services." And that on or about April 24, 2009, "Siemens' engineer supervised, inspected, and/or approved the alignment of the Turbine." National Union alleged that "Siemens breached the TFA Contract by failing to properly inspect, supervise and/or approve the alignment of the coupling between the HP/IP and LP rotors of the Turbine" and by failing to advise NRG of such errors or omissions. National Union alleged that Siemens breached its duty to exercise professional engineering skill and care by "failing to properly inspect, supervise and/or approve the alignment of the coupling between the HP/IP and LP rotors of the Turbine" and by failing to advise NRG of such errors or omissions.

National Union further alleged that prior to March 11, 2011, "Siemens representative(s) . . . programmed the Turbine for use in Unit 4." National Union alleged that "Siemens breached the TFA Contract by . . . failing to properly program the Turbine" and by failing to advise NRG of such error or omission. National Union alleged that Siemens breached its duty to exercise professional engineering skill and care by "failing to properly program the Turbine" and by failing to advise NRG of such error or omission.

### 2. Hatch's affidavit

In his affidavit, Hatch stated that his consulting engineer position involves "evaluating equipment failures and industrial accidents and performing root cause analyses and damage assessments" at energy plants. Hatch was retained to evaluate the cause of damage to a steam turbine generator at the Cedar Bayou facility on March 11, 2011. Hatch inspected the Turbine at the Cedar Bayou facility on March 22, 2011. He participated in inspections of the Turbine rotor and related components at Siemens' shop in Charlotte, North Carolina, on March 24, 2011, and April 21, 2011. He attended inspections and testing of the Turbine's

foundations at the Cedar Bayou facility on October, 23, 29, and 30, 2011. Hatch also "reviewed the design, construction, and installation documents regarding Siemens' design, programming, and installation of the [T]urbine, including Siemens' work under its agreement with NRG to perform Technical Field Assistance ('TFA Agreement') and the Steam Turbine Assembly Documentation."

Based on his understanding of the facts, investigation, education, training, and experience, Hatch stated that on March 11, 2011, the Turbine "was in start-up mode when it failed and tripped off line on loss of vacuum and high vibration when the [T]urbine reached approximately 3,570 rpm." Hatch indicated that this failure damaged the Turbine's rotors and related equipment. He opined that the Turbine's failure was caused by "misalignment of the coupling between the HP/IP and LP rotors of the [T]urbine by Siemens pursuant to its work under the TFA Agreement . . . on or about April 24, 2009." Hatch provided his "professional opinion that Siemens was negligent in performing its TFA work for the alignment of the [T]urbine" and that Siemens' "acts, errors and/or omissions . . . fell below the standard of care which reasonable and prudent installation . . . personnel would and should have exercised under the same or similar circumstances and failed to meet the standards set forth in the TFA Agreement."

Hatch also opined that the Turbine's failure was "caused or contributed to by an error by Siemens in the initial programming of the [T]urbine which prolonged the time during which Unit 4 was subjected to excessive vibration associated with the misalignment." Hatch provided his "professional opinion that Siemens . . . was negligent in its initial programming of the [T]urbine" and that Siemens' error "fell below the standard of care which reasonable and prudent . . . programming personnel would and should have exercised under the same or similar circumstances and failed to meet the standards set forth in the TFA."

8

### 3. Hatch's affidavit sufficiently sets forth the misalignment error.

With regard to Hatch's statement that the Turbine's shutdown "was caused by misalignment of the coupling between the HP/IP and LP rotors by Siemens pursuant to work under its TFA Agreement with NRG," Siemens first contends such conclusion "merely identifies a consequence of an alleged error" but "does not actually identify the allegedly erroneous act committed by Siemens." Siemens does not appear to have raised this argument in its motion to dismiss.[4] In any event, stating that Siemens misaligned the coupling between Turbine rotors in a particular location—between the HP/IP and LP rotors—specifies an alleged error.[5] *See, e.g., Sylva Eng'g Corp. v. Kaya*, No. 03-12-00334-CV, 2013 WL 1748754, at *4–5 (Tex. App.—Austin Apr. 18, 2013, no pet.) (mem. op.) (alleged failure to specify drainage inlets in the "critical area" near the gore in engineering plans asserted specific omission); *CBM Eng'rs*, 403 S.W.3d at 346 (alleged "structural flitch beam design error and omission of lateral bracing" in construction documents and specifications asserted specific error and omission). Hatch also causally linked Siemens' alleged error to the Turbine's failure on March 11, 2011, which damaged the Turbine's rotors and related equipment. *See Sylva Eng'g*, 2013 WL 1748754, at *4–5 (omission prevented proper drainage and contributed to traffic accident); *CBM Eng'rs*, 403 S.W.3d at 346 (error and omission in design contributed to "the instability of the Facility").

---

[4] *See Coleman v. Klockner & Co. AG*, 180 S.W.3d 577, 587 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("It is an established rule of Texas Procedure that, absent fundamental error, an appellate court has no discretion to reverse an otherwise error-free judgment based on a new argument raised for the first time on appeal.").

[5] The common pertinent meaning of misalignment includes the "wrong" "positioning or state of adjustment of parts (as of a mechanical or electronic device) in relation to each other." *See Merriam Webster's Collegiate Dictionary* 31, 793 (11th ed. 2003) ("mis-" and "alignment").

Next, Siemens complains Hatch's affidavit is so "conclusory" with regard to Siemens' TFA "work" that the trial court had to "erroneously infer" statutorily-required-but-omitted information.

To the extent Siemens challenges the competence of Hatch's testimony, neither the statute nor the case law imposes any requirement that averments and opinions in certificates of merit be competent evidence. *See Durivage v. La Alhambra Condo. Ass'n*, No. 13-11-00324-CV, 2011 WL 6747384, at *2–3 (Tex. App.—Corpus Christi Dec. 21, 2011, pet. dism'd) (mem. op.) (concluding there was no authority "establishing that a certificate of merit must fail if its statements are conclusory, or even that it must comply with rules of evidence"); *Benchmark Eng'g Corp. v. Sam Houston Race Park*, 316 S.W.3d 41, 47 (Tex. App.—Houston [14th Dist.] 2010, pet. dism'd by agr.) (while expert must be "competent to testify" under section 150.002(a), "the legislature did not include a requirement that statements in a certificate of merit must be competent as evidence").

Siemens contends that Hatch's affidavit does not inform the trial court what "work" was provided by Siemens under the TFA. However, Texas courts of appeals consistently have rejected similar arguments that an expert affidavit was "conclusory" or lacked specificity. For example, in *CBM Engineers*, the defendant engineering firm argued that the affidavit was conclusory because "any person reading the [certificate] would not know which structural flitch beam to which [the expert] was referring, nor where the allegedly omitted lateral bracing should have been located, nor how these alleged errors caused 'instability of the Facility.'" 403 S.W.3d at 345–46. The *CBM Engineers* court concluded the affidavit was not conclusory, explaining that "the statute does not require the certificate of merit to contain that level of detail" with regard to the alleged design error and omission. *Id.* at 346. In *Dunham Engineering*, the defendant engineering firm challenged the

10

affidavit for not providing specific facts regarding the "falsity" of the firm's evaluation and recommendation. 404 S.W.3d at 797. We rejected that argument where the plaintiff's theory of falsity could be shown by the fact the firm told its municipal client that the plaintiff's products were not an acceptable substitute under the bid at issue and the plaintiff's contention was that its products would have been considered "equal" under a proper specification. *Id.*

Here, according to Hatch's affidavit, Siemens' "work" under its agreement to perform technical field assistance for NRG involved installation of the Turbine and, pursuant to such "work," Siemens misaligned the Turbine. Contrary to Siemens' assertion that Hatch needed to describe "how or in what manner" Siemens allegedly misaligned the Turbine while performing its "work" for NRG, neither the statute nor the case law requires the certificate of merit to contain "that level of detail." *See CBM Eng'rs*, 403 S.W.3d at 346; *see also Gartrell v. Wren*, No. 01-11-00586-CV, 2011 WL 6147786, at *3–4 (Tex. App.—Houston [1st Dist.] Dec. 8, 2011, pet. denied) (mem. op.) (rejecting lack-of-specificity argument where affidavit identified alleged survey errors concerning acreage, house location, and existence of easements but did not describe "how or why the errors occurred"). Moreover, motions to dismiss for failure to file an adequate certificate of merit may be filed before discovery. *Dunham Eng'g*, 404 S.W.3d at 795. At this stage, National Union is not yet required to "marshal its evidence," and Hatch's averment that Siemens erred in misaligning the Turbine coupling while performing its technical field assistance "work" for NRG is not inconsistent with National Union's contentions that Siemens breached the TFA and was professionally negligent by failing to properly inspect, approve, supervise, and/or approve the Turbine's alignment, and by failing to advise NRG of such errors or omissions. *See id.* at 795, 797; *CBM Eng'rs*, 403 S.W.3d at 346 (statute does not require

11

plaintiff to "provide the full range of information that the defendant is entitled to obtain through formal discovery").

Siemens also takes issue with Hatch's description of Siemens' TFA role as "installation" personnel because, according to Siemens, its role "was limited to post-alignment *inspection* and *advising* NRG of any errors and/or omissions."[6] However, the statute does not require that engineers undertake contract interpretation. *See M-E Eng'rs*, 365 S.W.3d at 506–07 ("We cannot conclude that the Legislature intended to require affiants with expertise in such fields as engineering or architecture to opine regarding such far-afield subjects as contract construction or agency."). Further, section 150.002 does not foreclose Siemens from later filing other motions, such as motions seeking to exclude expert testimony or obtain summary judgment, based on the TFA. *See Dunham Eng'g*, 404 S.W.3d at 795; *CBM Eng'rs*, 403 S.W.3d at 346; *see also Coats v. Farmers Ins. Exch.*, 230 S.W.3d 215, 217–18 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (summary judgment appropriate when controversy can be resolved by proper contract construction).

In addition, Siemens contends that Hatch's affidavit requires the trial court to "fill in the blanks" as to how Siemens' "'work' relates to the provision of engineering advice, opinion, or judgment." However, a certificate of merit is not limited to setting forth an alleged "error or omission in providing advice, judgment, [or] opinion" as the exclusive ways to meet section 150.002(b). *See* Tex. Civ. Prac. & Rem. Code § 150.002(b). Rather, it is sufficient for the affidavit

---

[6] Both parties attempt to support their respective positions by pointing to the TFA. However, leaving aside any issue of the appropriateness of looking beyond the "four corners" of the certificate of merit, we conclude that the trial court had sufficient information within Hatch's affidavit itself to determine its compliance with section 150.002. *See Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, No. 03-10-00805-CV, 2011 WL 1562891, at *5 (Tex. App.—Austin Apr. 20, 2011, pet. denied) (mem. op.).

to set forth the alleged "negligence, if any, or other action, error, or omission . . . in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist." *See id.* The explanatory "including" phrase functions to enlarge rather than limit the previous phrase. *See id.*; Tex. Gov't Code Ann. § 311.005(13) (West 2013) (used in statute, "including" is term of enlargement and not of limitation or exclusive enumeration, and use of "including" does not create a presumption that components not expressed are excluded); *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179 (Tex. 2012). According to Hatch, Siemens allegedly provided "engineering services" and "Technical Field Assistance" to NRG for "installation" of the Turbine at the Cedar Bayou facility. *See Benchmark Eng'g*, 316 S.W.3d at 49 (noting that "the trial court is not required to ignore the obvious" with regard to what constitutes engineering practice).[7] We cannot conclude that Hatch's affidavit, which complains of Siemens' alleged error with regard to negligent installation of the Turbine, specifically its misalignment of the coupling between certain rotors, fails to set forth the negligence, or other action, error, or omission of Siemens in providing the professional service.[8]

---

[7] Siemens emphasizes that under the TFA it merely provided "advisory and other support" services to NRG. We note that if Siemens' position actually were that National Union's damages did not arise "out of the provision of professional services by a licensed or registered professional," then no certificate-of-merit requirement would even apply to National Union's claims. *See* Tex. Civ. Prac. & Rem. Code § 150.002(a).

[8] *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 150.001(3) (referencing Texas Occupation Code section 1001.003's definition of "practice of engineering"); Tex. Occ. Code. Ann. § 1001.003(c)(9) (West 2012) ("engineering for review of the construction or installation of engineered works to monitor compliance with drawings or specifications"); *id.* § 1001.003(c)(10) ("a service, design, analysis, or other work performed for a public or private entity in connection with a utility, structure, building, machine, equipment, process, system, work, project, or industrial or consumer product or equipment of a mechanical, electrical, electronic, chemical, hydraulic, pneumatic, geotechnical, or thermal nature"); *id.* § 1001.003(c)(12) ("any other professional service necessary for the planning, progress, or completion of an engineering service").

Finally, Siemens contends Hatch's affidavit does not "identify the applicable standard of care allegedly breached by Siemens"[9] nor inform the trial court regarding the specifics of Siemens' alleged negligence in performing its alignment "work." However, several Texas courts of appeal, including this court, have concluded that a certificate of merit need not include an express description of the applicable standard of care, how it was allegedly violated, or what specific actions should have been taken to comply with the standard of care. *See Sylva Eng'g*, 2013 WL 1748754, at *3–4; *Morrison Seifert Murphy, Inc. v. Zion*, 384 S.W.3d 421, 427–28 (Tex. App.—Dallas 2012, no pet.); *Gartrell*, 2011 WL 6147786, at *4–5; *Elness Swenson Graham Architects, Inc. v. RLJ II–C Austin Air, LP*, No. 03–10–00805–CV, 2011 WL 1562891, at *4 (Tex. App.—Austin Apr. 20, 2011, pet. denied) (mem. op.); *Benchmark Eng'g*, 316 S.W.3d at 45–46.[10]

In any event, Hatch's affidavit states he reviewed "Siemens' work under its agreement with NRG to perform Technical Field Assistance" and concluded in his professional opinion that "Siemens was negligent in performing its TFA work for the alignment of the [T]urbine." *See Elness Swenson*, 2011 WL 1562891, at *4 ("[N]egligence is, by definition, conduct that falls below the applicable standard of care. By averring that the licensed or registered professional's conduct is "negligent," the affiant is necessarily opining that the complained-of conduct did not meet the applicable standard of care."). Moreover, Hatch places Siemens' alleged negligence in the context of a particular standard of care—that of

---

[9] Although Siemens presents this "lack of standard of care" argument in a separate section of its brief, it does not include it as a separate issue within its statement of issues presented, and so we address it as a subpart of Siemens' first issue.

[10] *But see Criterium-Farrell Eng'rs v. Owens*, 248 S.W.3d 395, 400 (Tex. App.—Beaumont 2008, no pet.) (holding that "the certificate of merit must necessarily address the applicable standard of care and the defendant's failure to meet the standard"), *disagreed with by Morrison Seifert*, 384 S.W.3d at 427–28, *and Benchmark Eng'g*, 316 S.W.3d at 45–46.

"reasonable and prudent installation . . . personnel . . . under the same or similar circumstances," i.e., while performing contractual technical field assistance for a steam turbine. Hatch's certificate of merit, stating that Siemens' complained-of misalignment was negligent and referencing a standard of care, is sufficient to satisfy section 150.002(b). *See Sylva Eng'g*, 2013 WL 1748754, at *4 (statement that "[t]he acts, errors and/or omissions described above show that [KBR] and Sylva Engineering Corporation did not meet the Standard of Care for appropriate Civil Engineer roadway and drainage design and engineering, and constitute professional design negligence" was sufficient).

We conclude the trial court did not abuse its discretion in determining that Hatch's reference to Siemens' alleged Turbine coupling misalignment presents a sufficient professional error under section 150.002(b).

**4. Hatch's affidavit sufficiently sets forth the programming error.**

Next, Siemens argues Hatch's statement that "[t]he failure was also caused or contributed to by an error by Siemens in the initial programming of the [T]urbine which prolonged the time in which Unit 4 was exposed to excessive vibration" fails to satisfy section 150.002(b)'s requirements. That is, such statement "does not describe what specific error was committed by Siemens, what initial programming is, what role Siemens had in or related to the initial programming, how initial programming relates to Siemens' support services under the TFA Contract, or whether initial programming is even a professional engineering service." These lack-of-specificity arguments essentially repeat Siemens' position with regard to its alleged misalignment error.

First, we again disagree that an error in the initial programming of the Turbine "merely identifies a consequence of an alleged error, not the error itself." Stating that Siemens erred in the initial programming of the Turbine specifies an

15

alleged error.[11] *See, e.g., Sylva Eng'g*, 2013 WL 1748754, at \*4; *CBM Eng'rs*, 403 S.W.3d at 346. According to Hatch, the alleged programming error "prolonged the time during which Unit 4 was subjected to excessive vibration associated with the misalignment." In other words, the programming error was timing related and compounded the misalignment error. Hatch causally linked this alleged programming error to the Turbine's March 11, 2011 failure and resulting damages. *See Sylva Eng'g*, 2013 WL 1748754, at \*4; *CBM Eng'rs*, 403 S.W.3d at 346.

As discussed above, section 150.002(b) does not require an inordinate "level of detail" describing "how or why" the error occurred. *See CBM Eng'rs*, 403 S.W.3d at 346; *Gartrell*, 2011 WL 6147786, at \*4. Hatch's affidavit states that Siemens' "work" pursuant to an agreement to provide technical field assistance for NRG involved programming of the Turbine, and Siemens erred in the initial programming of the Turbine, which prolonged the time during which Unit 4 was subjected to excessive vibration associated with the misalignment. At this early stage of litigation, this alleged programming error by Siemens is not inconsistent with National Union's theories that Siemens breached the TFA and was professionally negligent by failing to properly program the Turbine and by failing to advise NRG of such error. *See Dunham Eng'g*, 404 S.W.3d at 795, 797.

As with Siemens' argument that Hatch's affidavit incorrectly described Siemens' TFA role as providing Turbine "installation" and "installation" personnel, we similarly cannot sustain its argument that the TFA does not require Siemens to actually perform initial "programming" or provide "programming" personnel for the Turbine. The statute does not require Hatch to interpret the TFA.

---

[11] The common pertinent meaning of an "error" in "programming" includes a "mistake" in "the planning, scheduling, or performing" of "a sequence of coded instructions that can be inserted into a mechanism." *See Merriam-Webster's Collegiate Dictionary* 425, 992 (11th ed. 2003). "Initial" describes when the error occurred: "of or relating to the beginning." *See id.* at 643.

*See M-E Eng'rs*, 365 S.W.3d at 506–07. Nor does it foreclose Siemens from later filing dispositive motions, including for summary judgment based on its interpretation of its scope of work under the TFA. *See Dunham Eng'g*, 404 S.W.3d at 795.

We also do not agree the trial court "necessarily had to guess" that an initial programming error constituted an error in providing a professional engineering service. According to Hatch, Siemens provided "engineering services" and "Technical Field Assistance" to NRG at the Cedar Bayou facility, which included "programming" of the Turbine. We cannot conclude Hatch's affidavit, which complains of Siemens' alleged error with regard to negligent initial programming of the Turbine, specifically that the error extended the time Unit 4 was subjected to excessive vibration associated with the rotor misalignment, fails to set forth the negligence, or other action, error, or omission of Siemens in providing the professional service.[12]

Finally, as with the alleged misalignment error, Hatch's affidavit states that he reviewed "Siemens' work under its agreement with NRG to perform Technical Field Assistance" and concluded in his professional opinion that "Siemens . . . was negligent in its initial programming of the [T]urbine," which error "fell below the standard of care which reasonable and prudent . . . programming personnel" would and should employ in similar circumstances. Hatch's certificate of merit, stating that Siemens' complained-of programming conduct was negligent and referencing a standard of care, is sufficient to satisfy section 150.002(b). *See Sylva Eng'g*,

---

[12] Properly initially programming a steam turbine so that it can be used within an electrical generation unit reasonably falls within the practice of engineering. *See* Tex. Occ. Code. Ann. § 1001.003(c)(10), (12); *see also In re Anloc, LLC*, 487 B.R. 825, 838–39 (Bankr. S.D. Tex. 2013) (describing section 1001.003's definition of practice of engineering as "broad").

2013 WL 1748754, at *4.[13]

We conclude that the trial court also did not abuse its discretion in determining that Hatch's reference to Siemens' alleged Turbine initial programming error presents a sufficient professional error under section 150.002(b). We overrule Siemens' first issue.

## B. The affidavit sets forth a sufficient factual basis for National Union's claims.

In its second issue, Siemens argues Hatch's affidavit fails section 150.002(b)'s requirement that the expert's affidavit "set forth specifically for each theory of recovery for which damages are sought . . . the factual basis for each such claim." *See* Tex. Civ. Prac. & Rem. Code § 150.002(b). We cannot agree.[14]

"The certificate of merit must provide a factual basis for the allegations of professional errors or omissions." *CBM Eng'rs*, 403 S.W.3d at 345. The plain meaning of "factual basis" "requires an affiant to describe the facts giving rise to the claim." *Dunham Eng'g*, 404 S.W.3d at 796 (citing *Benchmark Eng'g*, 316 S.W.3d at 48). The affiant is not required, however, to "explain the law to the trial court" or provide "operative facts other than the professional errors and omissions that are the focus of the statute." *Id.* Moreover, while "factual basis" is not defined in the statute, courts, including ours, recognize that the purpose of the certificate of merit "is to provide a basis for the trial court to conclude that the

---

[13] *See supra* note 9.

[14] To the extent that Siemens repeats its lack-of-specificity arguments from its first issue, we addressed and rejected them in Sections III.A.3 and III.A.4. Siemens has provided us with, and we have located, no authority supporting Siemens' position that Hatch's affidavit is insufficient because he fails to identify the Siemens' individual who committed the alleged errors, or specifically how or when the errors were committed. Siemens also continues to dispute its particular role and scope of work under the TFA, but again, while this may present fodder for a later fight on summary judgment, it is not a proper inquiry for this threshold certificate-of-merit stage.

18

plaintiff's claims are not frivolous." *Id.* at 795–96; *see CBM Eng'rs*, 403 S.W.3d at 345; *Durivage*, 2011 WL 6747384, at *3; *Elness Swenson*, 2011 WL 1562891, at *4. We evaluate whether a "factual basis" has been established with this "threshold" purpose in mind. *See M-E Eng'rs*, 365 S.W.3d at 504; *Durivage*, 2011 WL 6747384, at *3. We also keep in mind that "[t]he requirement to show a 'factual basis' is less onerous than that imposed on, for example, health care liability plaintiffs" under chapter 74. *Dunham Eng'g*, 404 S.W.3d at 796 n.4; *see Durivage*, 2011 WL 6747384, at *3.

The "factual basis" requirement of section 150.002(b) is met where the expert "identifie[s] the factual basis upon which he based his professional opinion," such as "his review of the structural drawings issued for construction that were prepared by a professional structural engineer who worked for [defendant engineering firm]." *CBM Eng'rs*, 403 S.W.3d at 346 (reversing trial court's dismissal of plaintiff's negligence claim). Likewise, affidavit testimony that the expert had "walked the subject property and [had] prepared a survey of [his] own on the subject property" has been held to provide the required "factual basis" for the expert's statements identifying the defendant land surveyor's alleged survey errors. *Gartrell*, 2011 WL 6147786, at *4; *see also Dunham Eng'g*, 404 S.W.3d at 796–97 (rejecting argument that affidavit lacked sufficient "factual basis" where expert opined defendant engineering firm and defendant engineer committed professional errors based on his review of engineering project plans and specifications, and correspondence by the parties); *Morrison Seifert*, 384 S.W.3d at 428–29 (same where expert opined defendant architecture firm committed professional errors based on his review of project-related design documents and certain testimony).

Similarly, here, we conclude Hatch's affidavit identifies a sufficient "factual basis" upon which he based his professional opinions that Siemens' alleged misalignment and programming errors were negligent and "failed to meet the standards set forth in the TFA." That is, Hatch testified regarding his review of "the design, construction and installation documents regarding Siemens' design, programming and installation of the [T]urbine, including Siemens' work under its agreement with NRG to perform Technical Field Assistance ('TFA Agreement') and the Steam Turbine Assembly Documentation." Hatch also provided details of his root-cause investigation of the March 11, 2011 Turbine shutdown, including multiple dates and locations, and his actions in examining and photographing the plant and Turbine, inspecting "the [T]urbine rotor and related components," and attending "additional inspections and testing of the [T]urbine's foundation." Hatch described the Turbine's failure during start-up mode—it tripped off line on loss of vacuum and high vibration, when it reached about 3,570 rpm. "Based on [his] understanding of the facts, investigation, education, training, and experience," Hatch then attributed the cause of the Turbine's failure and resulting damages to Siemens' April 24, 2009 coupling misalignment error pursuant to its TFA work and to Siemens' error in initial programming of the Turbine, which lengthened Unit 4's exposure to excessive vibration associated with the misalignment.

Siemens nevertheless asserts that Hatch's affidavit and National Union's petition are "remarkably divergent." However, the primary case Siemens relied on in the trial court, and continues to rely on here, is distinguishable. In *Garza v. Carmona*, the "crux" of the plaintiffs' negligence claim was that the defendant engineering firm failed to supervise the construction contractor and correct his errors, but the affidavit—while arguably detailed in the firm's own alleged errors with regard to a lack of proper contractual documents and omissions in

20

construction documents—was "wholly silent on" the firm's alleged actions as they related to the contractor's work. *See* 390 S.W.3d 391, 396 (Tex. App.—Corpus Christi 2012, no pet.).

Here, the "crux" of National Union's theories of breach of contract and negligence is tied to Siemens' own performance of the TFA whereby it was allegedly charged with providing technical field assistance to NRG in connection with Siemens' steam turbine. National Union asserts that Siemens' failures in improperly aligning and programming the Turbine, and in not advising NRG of such errors, breached the TFA and constituted professional negligence. According to Hatch, Siemens' misalignment of the coupling of specific rotors within the Turbine, which contributed to its failure, constituted negligence. Likewise, Siemens' error in the initial programming of the Turbine, which contributed to its failure and compounded the misalignment error, constituted negligence. Whether Hatch is correct that Siemens' technical field assistance work under the TFA with NRG in fact related to "installation" and "programming" of the Turbine, the affidavit further alleges that Siemens' misalignment and programming errors "failed to meet the standards set forth in the TFA." Unlike in *Garza*, there is no disconnect between Siemens' errors as alleged in Hatch's affidavit and in National Union's petition.[15]

---

[15] Siemens' other cases are distinguishable in that they involved multiple defendants. Because the affidavits at issue did not clearly indicate that one particular defendant was involved in a particular professional error, the trial courts abused their discretion in denying the motion to dismiss. *See Sylva Eng'g*, 2013 WL 1748754, at *5 (although petition asserted that KBR's and/or Sylva's roadway design improperly contained flat pavement slopes, "[t]he affidavit does not indicate that Sylva was involved in designing the slope of the road, but rather states that Sylva was a subcontractor that KBR employed for the engineering of the drainage inlets discussed above"); *Robert Navarro & Assocs. Eng'g, Inc. v. Flowers Baking Co. of El Paso, LLC*, 389 S.W.3d 475, 482 (Tex. App.—El Paso 2012, no pet.) ("One cannot ascertain the nuanced distinctions based upon Spencer's affidavit. We thus agree with Appellants that the statutory language does not allow for collective assertions of negligence."). Here, Hatch's

21

Finally, Hatch's assertions provide a sufficient "factual basis" for both National Union's negligence and breach-of-contract claims. *See* Tex. Civ. Prac. & Rem. Code § 150.002(b). Although Siemens contests its role and the scope of its work under the TFA, there is no dispute that Hatch's affidavit describes the existence of an agreement with NRG for Siemens to perform technical field assistance and identifies the TFA at issue. Hatch further states that he reviewed the TFA, and opined that Siemens' misalignment and programming errors constituted negligence and did not meet the standards set forth in the TFA. *Cf. Durivage*, 2011 WL 6747384, at *4 (affidavit did not provide "factual basis" for plaintiff's contract claim "because it does not state any facts regarding the existence or breach of any contract").[16]

We conclude that Hatch's affidavit describes the facts giving rise to National Union's breach-of-contract and negligence claims and thus provided the trial court a basis to conclude that such claims are not frivolous. *See Dunham Eng'g*, 404 S.W.3d at 797. Therefore, the trial court did not abuse its discretion by refusing to dismiss National Union's claims. *See id.* We overrule Siemens' second issue.

---

affidavit references sole defendant Siemens in connection with both the misalignment error and the initial programming error.

[16] Even where the expert does not describe the contract at issue and its alleged breach, or "couches" certain errors "in terms of negligence," courts have concluded that affidavits contained a sufficient "factual basis" for breach-of-contract claims. *See, e.g., Packard Eng'g Assocs. v. Sally Grp., L.L.C.*, 398 S.W.3d 389, 394 (Tex. App.—Beaumont 2013, no pet.) (rejecting "the notion that the portions of Brown's affidavit that characterize Packard's acts and omissions as negligent may not also serve to provide a factual basis for appellees' breach of contract claim"); *M-E Eng'rs*, 365 S.W.3d at 505–06 (rejecting defendant engineering firm's argument that affidavit lacked a "factual basis" for plaintiff's breach-of-contract and breach-of-warranty theories because "Long did not describe the contracts or warranties at issue or specify any particular provisions thereof that Tochihara or M-E allegedly breached").

## IV.  CONCLUSION

Accordingly, we affirm the trial court's denial of Siemens' motion to dismiss.[17]

/s/        Marc W. Brown
                Justice

Panel consists of Justices Boyce, Christopher, and Brown.

---

[17] Because we conclude that Siemens has failed to demonstrate any abuse of discretion by the trial court in denying Siemens' motion to dismiss, we need not address its third issue. *See* Tex. R. App. P. 47.1.